IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 11, 2018 Session

## ANUPAM SINGLA v. ANUPAM GARG SINGLA

**Appeal from the Chancery Court for Williamson County**
**No. 44502    Joseph A. Woodruff, Chancellor**

_____

### No. M2017-01278-COA-R3-CV

_____

Anupam Singla ("Husband") appeals the May 23, 2017 final order and judgment of the Chancery Court for Williamson County ("the Trial Court"), which, among other things, awarded Anupam Garg Singla ("Wife") a divorce on the ground of inappropriate marital conduct, found that Husband had dissipated marital assets, divided the marital property, awarded Wife rehabilitative alimony and alimony *in futuro*, and entered a Permanent Parenting Plan for the parties' minor child. Husband raises issues regarding the awards of alimony, the finding that he dissipated marital assets, and whether the distribution of marital assets was equitable. We find and hold that the Trial Court did not err in finding that Husband had dissipated marital assets, but we modify the finding to reflect that Husband dissipated only $73,010 in marital assets. We further find and hold that the Trial Court did not err in awarding Wife rehabilitative alimony and alimony *in futuro*, and that the Trial Court did not err in its division of the marital assets. We, therefore, affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed, as Modified; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which RICHARD H. DINKINS and W. NEAL MCBRAYER, JJ., joined.

Loren A. Sanderson, Murfreesboro, and John Heacock, Nashville, Tennessee, for the appellant, Anupam Singla.

Neil Campbell, Franklin, Tennessee, for the appellee, Anupam Garg Singla.

## OPINION

## Background

Husband and Wife were married in December of 2006. One minor child ("the Child") was born of the marriage. Husband filed for divorce in September of 2015. The case proceeded to trial in April of 2017.

Husband testified at trial that he was 40 years old.[1] He explained that he is from India. He is not a United States citizen but instead is a permanent United States resident who holds a Green Card. Husband has a Bachelor's Degree in science and a Master's Degree in computer applications, both of which he obtained from universities in India.

Husband met Wife in India in December of 2006. Husband explained that their marriage was an arranged marriage and that they were married in December of 2006. Husband was working in the United States at the time of the marriage. Husband had been working in the United States for 11 months prior to the marriage. Prior to the marriage, Wife was a teacher teaching computer science to middle and high school students in India. Wife has a Master's Degree in computer science, which she obtained from a university in India. Wife moved to the United States a few weeks after the marriage, and the parties initially resided in California where Husband was employed by a bank.

Husband testified that Wife obtained a work permit within the first year of the marriage. Wife obtained a driver's license in 2012. Wife, however, did not obtain a job in the United States until 2014. The Child was born in 2009, and Wife stayed home with the Child until February of 2014, when Wife obtained a job in an export house. Husband testified that Wife had attempted to apply for information technology ("IT") jobs in 2009 and 2010, but was not hired for those jobs.

Husband testified that Wife went to India in 2013 to visit her family. Wife was in India for approximately two months and three weeks. Husband cared for the Child while Wife was in India. At that time, Husband's parents came to live with Husband to assist him.

Husband admitted recording Wife's telephone calls in 2013 without her knowledge. Husband also admitted that he denied recording Wife's telephone calls when

---

[1] As this case is factually intensive, we find it necessary to state in detail the evidence presented and the Trial Court's order.

2

he first was questioned about recording the calls. Husband claimed that he could not remember how many times he had recorded Wife.

Husband filed for divorce in California in 2013, but later dismissed the suit. He admitted that he made cash withdrawals of $10,000 and $4,000 from his accounts in 2013. When asked the purpose of those withdrawals, Husband stated that he thought that the money was used as a down payment for his Toyota Highlander.

In December of 2014, the parties moved to Louisville, Kentucky. Husband testified that the parties lived in Louisville for three to four months before moving to Franklin, Tennessee.

Husband testified that the parties had an argument in August of 2015. Husband left the apartment where they lived and stayed in a hotel for a while. Husband testified that he returned to the apartment on September 7th and discovered that Wife and the Child no longer were living there. Husband later discovered that Wife had moved to Ohio with the Child. Husband filed for divorce, and Wife returned to Franklin, Tennessee on October 6, 2015.

Husband was questioned further about the parties' separation on August 28, 2015 when he left the apartment, returned to find Wife still there, left again, and then returned to find Wife gone. He was asked if he told Wife to leave, and he stated:

> I -- I asked like we cannot no longer live together and then I asked her like you can find a like a one bedroom apartment so that, you know, even I'm looking for that and we can split rent. . . . No, no, not to leave. I asked her to look for a one bedroom apartment as I'm - - as I'm already left this home and I'm also looking for the same.

Husband was asked if he terminated the lease on the apartment, and he stated: "No, I didn't I - - it's like a notice, which I said, I'm not - - I - - I'm not going to stay in this apartment and she's also a joint leaseholder as an adult which is apartment policy." Husband was asked if he remembered stating during his deposition that he submitted a termination of the lease and told Wife she needed to look for a new apartment, and he stated: "No, I didn't say, she needed to look - - yes, I said like - - that's I - - I - - I - - you're making me repeat only, it's the same thing. I asked her to look for a one bedroom apartment. I never asked her to leave, that doesn't mean I asked her to leave." Husband was asked why he told Wife to look for a one-bedroom apartment, and he stated: "Because if we're going to stay alone, if we're not staying together, so that we could just split rent, we'll have to pay less." He was asked what he expected would happen to the two-bedroom apartment the parties had been living in, and he stated "that will eventually

3

go away like - - . . . ." When questioned further, Husband admitted that he did submit a notice to terminate the lease.

Husband was asked what he expected would happen to Wife when he submitted the lease termination, and he stated that it was a two-month notice and that she could stay there for 60 days and pay the charges and within that time could find another apartment. Husband admitted that at that time he was employed, and Wife was not. Husband was asked how Wife was supposed to pay for an apartment, and he stated:

> No, still like even if she maintains it or lives in the same apartment, if she goes back to the apartment and says, hey, I'm going to live here only, and then the apartment they will come after me to pay for the rent. I'm not saying they have to come after me. It is still me who has to clear the dues and if she decided to move to another one bedroom and that's what I offered her, that's exactly what I said, like if you move, of course, I'm going to pay.

Husband admitted when pressed that he gave Wife no money in July of 2015. He further admitted that in August of 2015 he gave Wife only $200, and in September of 2015 he gave Wife only $300. Husband admitted that he did not transfer any more money to Wife until October of 2015 after she returned from Ohio. At that time, Husband paid Wife $1,700 in temporary support. Husband admitted that he did not take the Child with him when he moved out.

Husband was asked if he ever called Wife a 'zero person,' and he denied doing so. Husband then was shown a copy of his deposition wherein he admitted to doing this, and he stated: "No, I - - I don't accept that." A portion of Husband's deposition was read at trial wherein Husband first denied calling Wife a zero person and then finally admitted that he might have done so in anger. Husband claimed he could not recall saying that. Husband denied hitting Wife, twisting her arm, pulling her around by her nose, throwing a chair at her, and causing her to bleed or bruise.

Husband testified that he has a 401(k) with a value of approximately $93,000. In 2015, Husband took a loan against his 401(k) to start a business. Husband testified that he obtained a loan of $43,600 and has been paying it back. The business Husband started is JS Exports. Husband testified that JS Exports was both opened and closed in 2015. Husband stated that the business "was about exporting of cardboard so like there are paper mills back in India, so it was that's used as raw material there in those mills." Husband testified that he made no money from JS Exports. He also testified that Wife knew about the business. He stated that it was formed in her name:

4

because she wanted to do something and while she was looking for job, and so - - so that's what we thought we talked with each about this is an opportunity probably we can make - - start a business and then I will be just supporting you for, you know, finding clients on that. So that's what we discussed in between, and that's why this company was formed and the business was started.

Husband testified that Wife was to be the owner of the business and stated that they "both will support each other and I will also help her in running the business." Husband was asked what role he would have in the business, and he stated: "Finding clients, basically who can provide us raw material and doing export paperwork." Husband testified that the tax return for the business "showed a no business activity on that, so there was no profit, no loss, no return." On his income and expense statement, Husband listed the value of JS Exports as $4,000 and stated that he has 50% ownership of the business.

Husband owns a 2007 Toyota Highlander, which was purchased in January of 2013. On August 14, 2015, shortly before the parties separated, Husband purchased a 2013 BMW 528i xDrive. Husband testified that the BMW cost around $42,000 and that he put $12,000 down and financed the remainder. He testified that he took $6,000 from his 401(k) and the other $6,000 for the down payment came from his bank account. Husband testified that the current value of the BMW is approximately $21,980. Husband owes $21,116 on the BMW. Husband testified that he drives both the BMW and his Toyota Highlander. He was asked why he needed a BMW when he had a Toyota Highlander, and he stated: "I just have two vehicles. One vehicle is already transferred on wife's name - - so I have two vehicles and one has already been transferred to wife's name." When questioned further, Husband admitted that he has both the BMW and the Toyota Highlander and that Wife has a Toyota Camry. Husband admitted that there is nothing wrong with the Toyota Highlander and that it is fully operational. He also admitted when questioned further that he did not need the BMW and that the expense and insurance, which he listed on his income and expense statement as $518 per month, is unnecessary.

Husband is employed by Cognizant Technologies. Husband testified that his annual salary is approximately $130,000, and he is also eligible for a 10% bonus. Husband stated, however, that the bonus is not guaranteed. Husband's tax return showed his income for 2016 as $137,685.58.

Husband asserted that Wife needs alimony for only two or three years. He testified that Wife is qualified to work in the IT field and as a teacher and that Wife would need three to six months of vocational training to qualify for an entry level position. Husband testified that Wife then could earn $65,000 per year. Husband was

asked if his communication skills were better than Wife's and he stated: "We at - - at the same level." When questioned further, Husband admitted that Wife will need basic skill training and classes to help her communication skills.

Husband admitted that he agreed during the parties' mediation to give Wife one-half of the parties' tax refund for 2015. He admitted that at the time of trial he had given her none of that money. Husband claimed he owed Wife $900 for the tax refund. Husband admitted that the full refund was $3,552. He was asked why he claimed to owe Wife only $900, and he stated: "Actually I paid for tax filing through consultant so that's - - that's what I'm just taking off from this figure." When pushed, Husband admitted that he owes Wife $1,776 for the tax refund. Husband also admitted that the order entered from the mediation stated that he agreed to pay that money within three days of receipt of the refund. Husband received the refund in June or July of 2016. He still had not paid Wife her share by the time of trial in April of 2017. When asked why he had not yet paid Wife, Husband stated: "Sir, it is just my mistake, like, I should have."

Husband also agreed that he was ordered to pay Wife $12,731. Husband admitted he wrote a check on June 26, 2016 for $12,500, and that he then stopped payment on that check before Wife could cash the check. He stated: "Yes. So at the time of my mediation when this Agreed Order was entered so I was not given a copy of it and my attorney was on leave and when I wrote a check, I wrote it for $12,500, but later I learned this check is $12,731, and I stopped this check and give her a cashier's check for the correct amount." Husband admitted that the order provided that he was to pay Wife no later than the close of business on May 27, 2016. Husband was asked why he didn't even write the first check until June 26th, and he stated:

> I - - I - - let me clarify. Because it was an Agreed Order, entered order in which I was in agreement to. It was never my intention at any point of time to not pay her dues; right. So I - - I don't exactly recall what happened why it was late, but yeah, there was some mess up there because I was not having the Order and I want to - - something happened in - - during that period but I made all of my, you know, best effort attempt because it's an Agreed Order. I can not evade that in any case. . . . No, it's just my negligence, and it's all as an Agreed Order and I have to pay what I have to pay. . . . Actually let me clarify you on that. Because we were separated and we had to file income tax year for the year 2015, and so there were two ways of filing that income tax return as a head of household or as a joint, married, filing jointly and I also had to take an extension to file my taxes because I was filing for both my parents and I had to personally appear in the Nashville office so that - - so during that period the amount which I'm supposed to pay I didn't even know, right, what amount I'm getting

refunded to tax return. So there were so many things going on during that period, but it was never my intention to never pay her half of that tax return.

The $12,771 eventually was paid to Wife, but Husband admitted that Wife had to file motions to compel the payment.

Husband testified that his parents have been living with him for almost two years. Husband's parents are not permanent United States residents, but Husband plans to assist them in obtaining Green Cards. Husband admitted that he filed an affidavit that stated that he was giving his parents $500 per month in support. When asked if he testified during deposition that he was giving his parents $800 to $900 per month, he stated that he could not recall but did not deny making this statement. Husband again was asked how much he was giving his parents, and he stated: "Like for last two years they living with me so there is no separate money I'm paying right now." Husband then was asked why he listed a payment of $500 per month to his parents on his income and expense statement, and he stated: "That's because when they are in India that's - - that's the money generally like on an average I would give to my parents."

Husband was asked why during discovery he did not disclose bank account . . . 4257, and he stated: "Because even I didn't know that - - that bank account exists." He admitted that he had claimed this account did not exist, and he stated: "Yes, I said like to the best of my knowledge I don't have that bank account." Husband also previously denied having accounts . . . 4564 and . . . 6194. When questioned at trial, Husband admitted that he did have accounts 4257, 4564, and 6194, all with Bank of America. Husband claimed these accounts were closed in 2013 or 2014, and stated in his deposition in 2015 that they were "not operational." At trial, it was shown that account 4257 was closed in March of 2015, account 4564 was closed in January of 2014, and account 6194 was closed in July of 2014.

Husband was asked if he remembered being asked to produce information regarding every account he had closed or opened within the last five years, and he agreed that he was asked to produce this information. He was asked why he did not disclose those accounts when requested during discovery, and Husband stated: "Because I was not aware of at the time of my discovery like I'd had these accounts and I - - I didn't even remember at that time of the discovery like disclosing these accounts like this happened, they are - - I have to get - - ." Husband claimed he forgot about those accounts.

Husband admitted that he transferred $5,000 to account 4257 in December of 2014. He claimed that he does not remember why he transferred this money. He also

admitted that on that same day he transferred $6,300 to account 4257. When asked why he transferred this money, Husband stated:

> Yes. I remember. So I was running a loan from my Sony and prior 401(k) loan and when I quit my company you have to either repay back the remaining balance or you have to take a penalty, so that I never wanted to do. So I loaned this money from my sister Sapno so on 12/4/2014 for the amounts if $6,000, and that money I transferred to the 4257, and then I paid it to the JMC - - paid back that loan amount so that was the purpose.

Husband claimed that the $6,000 came from his sister. Husband testified that he took this loan from his sister in December of 2014, to pay back the 401(k) loan he had taken before he left Sony. He claimed that he paid it back after he had filed for divorce. Husband admitted that during discovery he disclosed no debt owed to a sister or to any friend. He stated: "Yes, at that point of time, and I had knowed at that point in time."

Husband claimed that account 4564 was closed in 2012 because it had been hacked. He was shown evidence of transfers from that account happening in 2014 and was asked why he did not disclose the account, and he stated: "Because I didn't even remember all the closed accounts and that was the sole reason."

Husband admitted that he transferred $4,000 to Jaglesh Singla on May 26, 2011. Jaglesh Singla is Husband's father. When asked what the purpose of the transfer was, Husband stated:

> The purpose of transfer was like we, my wife and my friend, Bradish they had started a business for the kids at (inaudible) import back from India and so we got our stuff manufactured from India and for that import, the - - the Apple which we imported from India, so we paid that money to the manufacturer and my father was like he used to have a company back in India and he was getting all of the manufacturing done from different manufacturers, contacting them, getting it packaged and doing all export paperwork, and sending it over to us over here, so for that I transferred this money.

Husband was asked if Wife was aware of this, and he stated "Yes, she was owner of the business. She knew it." The business was Globus Trans, LLC. Husband was asked why he had stated that Wife did not work from the date of the marriage until 2014 if she had been running this business, and he stated: "She - - she did - - she did - - she was not an employee of the company but she was running a business so that's what I mean."

8

Husband also admitted that he transferred $8,500 to Mr. Singla in August of 2011, which he claimed was for the same purpose.

Husband claimed a loss on the parties' income tax returns for 2012 and 2013 for the Globus Trans, LLC business. Husband testified that Wife's name was listed on the business, and they filed tax returns jointly. He testified that they claimed a $7,551 loss for 2012 and a $13,143 loss for 2013.

In September of 2014, Husband transferred $4,000 to Asa Brojachia. Husband claimed Mr. Brojachia was a partner in the exporting business and that Mr. Brojachia gave him the money, and Husband just returned that money. When asked to clarify if what he was saying was that his partner put money in the business and that Husband paid him back, Husband stated: "No. So there has some other transactions with the partner, we need to try the whole picture over here to understand the whole thing of it like - - but that was one of the reasons." Husband agreed when asked that this was a debt to him and that he did not disclose this in discovery. He also admitted that the money did not come from a business account, but instead came from his personal account.

Husband transferred $11,005 to ICICI Bank in India from one of the accounts he had failed to disclose, account 4564. Husband claimed he never had an ICICI bank account. Husband claimed his father owns the ICICI account. When asked why he transferred money to his father's account, Husband stated: "So all these accounts they are my father's accounts and the one matching with Jaglesh Singla, they are all ICIC accounts of my father and so the money was sent for the same purpose." Husband was asked why if the purpose was business-related the money was not transferred from the Wells Fargo business account, and he stated:

> I don't remember exactly why I did that, and we use to fund this business from two sources that was my salaried account, so 4564 was my salary account at that time and we also used to fund this business from Bradish account who was the owner with my wife.

Husband then was asked why he had testified during his deposition that Wife did not have access to any of his other bank accounts, and he stated: "I - - this is coming from 2011 and my depositions happen in 2015." Husband admitted that he had testified that Wife did not have access for ten years. He stated: Yes, to the best of my knowledge, I said yes." Husband was asked if when he stated that 'they' had funded what he really meant was that 'he' had funded and that Wife had nothing to do with it, and he stated: "Yes, because she was not owning at that time. . . . So, in fact, I was helping to set up a business under her name." Husband was asked if the transfers benefitted the marriage, and he stated:

9

What I believe is like a - - because I was married to Indian wife and we have an Indian culture and if wife's father is not earning anything then that's part of our culture like we support our parents who has no other source of income, and that's directly or indirectly for the benefit of marriage only. The way you may want to put it.

Husband admitted transferring $1,468.75 to his father's account in India and stated that money was for the living expenses he gave to his parents. Husband was asked if that transfer had no marital purpose, and he stated: "Yes, as per US law, yes."

Husband admitted he made a transfer of $7,500 on April 25, 2012 to his Citibank India account. He admitted that he had testified during his deposition that he could not access the statements for that account. Husband made a second transfer of $7,500 to his account in India in June of 2012. Husband was asked several times where the money now was, and he finally answered: "No, it's not in the Citibank in India. That money was transferred to my parents before filing of this divorce."

During discovery, Husband stated that he had made no wire transfers during the last five years. At trial, Husband admitted that this was not true. He was asked why he had claimed he had made no wire transfers, and he first stated that his prior attorney represented that the scope of the inquiry was only two years and then when questioned further about whether he was blaming counsel he stated: "No sir, I'm not saying that. . . . So I just forgot to provide these statements. I had to - - those were like these statements are - - were like more than three years back at that time."

Husband received a deposit of $10,000 in June of 2013. He was asked what that money was for, and he stated: "It's like between my brother-in-law, sister and myself, like on different occasions, I used to take money, you know, for - - I - - I don't remember the reason why I - - I took money at that point." Husband claimed he paid that money back.

Between April 23, 2015 and June 23, 2015 Husband transferred 2,000,291 rupees to his parents. Husband claimed that at that time the exchange rate was around 65 rupees per dollar, making the amount in dollars $35,246. When asked to clarify, Husband agreed that he transferred approximately $36,000 to his mother. He admitted that during discovery he claimed he had transferred $29,000 to his parents not $36,000, and that this statement was not correct. Husband stated: "Yes, because as I previously testified, I had no access to the account so that's what I - - the best of my knowledge I gave." Husband testified that the money still is sitting in his mother's account. When asked, Husband agreed that his mother is holding the money for him. Husband testified that the money

his mother is holding for him is different from the $800 to $900 he gives his parents monthly.

When questioned, Husband admitted that while the divorce was pending, he withdrew approximately $8,100 from his accounts in 2016 and $8,155 in 2017.

Wife testified at trial about Husband's behavior toward her. She stated that Husband would:

> squeeze my face and tap on my head. He pulled my hair also. He slapped me, he turned - - he turned my arm at the back and pushed me on the bed. He pulled my nose. He pulled my [necklace] chain also. . . . And tapped on my head and he threw things on me. He threw the kids book, the Charlotte kid's books on me from for me, like he was sitting here and he threw books on me, like. . . . Yeah, books. The fat books, small, fat books he threw them.
>
> When my daughter was three years old, she had some books, like fat books, he threw them on me. . . . In the beginning was fine but eventually, he was - - eventually he was - - he wasn't pleasing. Like if I - - I was not stopping him. So he thought he would - - he would not do anything. He was getting - - he - - he - - he gets anger . . . - - very soon and then when he feels that, when he gets angry, then he hits me. . . . In the - - in the beginning, he used to, like in - - it was, you know, in 2008, it was fine. He was - - once he just - - he got angry and he threw the tea on the wall and then his father came in 2000 - - 2007 or '08, I showed him that - - that he threw the tea on the wall. There was a tea still there and he said, I used to throw the plate, his father said, I used to throw the plate. . . . In 2012, when he came to know, like nothing is in my name. I'm - - I'm not having plot on property, on my name, then his behavior getting change. He was - - he - - he pulled my hair in 2012 and dragged me and send me and my daughter in to India in 2012.

Wife testified that Husband has called her names. She stated: "He called me daughter of donkey. He called me dog's tail. He called me bitch. . . . [H]e called me zero-person." When she was asked what Husband meant by that, Wife stated:

> I think my communication skill is not good and whenever we go - - goes to some store, in front of sales person, he - - he - - he said, you will talk to me in English, okay? You will talk to me in English, like this. Then if we were discussing in Hindi, then he used to say, you will talk to me in English

11

in front - - in front of the sales person.  Then - - then at home also, he - - if I'm not able to do what he - - the way he wants, then he calls me zero-person.

Wife testified that she and the Child went to India from March of 2012 until the first week of June of 2012.  In 2013, Wife again wanted to go to India to visit her father.  She wanted to take the Child with her, but Husband refused to give Wife the Child's passport.  Wife testified that she did not have access to her own passport or the Child's.  Husband kept the passports in a bank locker, which he alone could access.  Wife testified that she went to India alone in September of 2013.  Wife stated that she went to India because her father was ill and upset about her relationship with Husband.

Wife testified about what happened when she returned to the United States after visiting her father in 2013.  She stated:

> When I came back to America, I called from the airport.  He did not answer.  Then I went to - - I - - I went to home by taxi, nobody was at home.  And then I went to the landlord.  He said, I'll come back to this home in the afternoon and he took [the Child] with her, and when he gave the keys of the apartment, it was a single family home we were renting.  He gave me the keys of the home and he said that when I opened the home, there was no stuff inside the home, only one bed was there.  No Internet.

When asked if she was saying that when she returned to the home she found that Husband had taken the Child and moved to a new residence, Wife agreed that was what she was saying.  Wife testified that she previously had notified Husband by email when she would return.  Wife testified that the next day she went to the landlord, and the landlord called Husband.  Husband then brought the Child to Wife.  Wife lived with the Child in the marital home for a few days, and then Husband told her she needed to move.  Wife found a space in a group home where she lived from December 15, 2013 until the end of March of 2014 before the parties reunited and resumed living together.

Wife testified that the parties went to Best Buy in January of 2015 to purchase a washer and dryer.  Husband asked Wife to open an account, which was used to purchase the washer and dryer.  Husband still has the washer and dryer.  In February of 2016, Wife learned that Husband was not making payments on the account.  She testified that she called Best Buy, and stated:

> When I called them, Best Buy, customer in service, they said the payment had not been made on this account.  And then I - - then I asked from them the - - what the balance.  Well, the balance was more than

12

expected. Then I asked them how it is possible, it was - - we bought only washer dryer from that. They give me the list. They give two, three items. They telling me that you bought some $500 camera or phone, and there was two, three - - two or three more purchase, and it happened after he filed the divorce. It was in October and December.

Then on hearing that, I requested that guy to can you please stop on the purchases because I told him that this Best Buy card is not with me and I don't want no further purchases on that card.

Wife cannot close the Best Buy account because a balance is due. Husband has the card for the account. Wife was asked if she knew why Husband stopped paying on the account, and she stated: "He said that I - - I put stop on purchases and that he was - - he felt angry and that's why he stopped the payment on that."

Wife was asked if she consented to Husband purchasing the BMW, and she stated: "No. On the day of - - on the day they were going to buy the BMW, that day he told me that he was going to buy the BMW and that's why he said they're going to New York." Husband flew to New York to purchase the BMW.

Wife testified that she was not told when Husband opened JS Exports. Wife never did any work for JS Exports. Wife testified that she had heard that Husband had JS Exports, but was not aware until Husband testified at trial that the business was in her name. Wife was asked what she knew about the Globus Trans business, and she stated: "Globus Trans, it - - it - - it was opened in 2010 on my name, and it was opened for kids, April." Wife never did any work for Globus Trans and never had access to the Globus Trans accounts. Wife was aware that Husband had used her name for that business because she stated: "[h]e said, well, we will open the business on your name because he's already working and cannot have open business on his name."

Husband's parents began living with the parties in May of 2015, several months prior to the separation. Wife was asked about what happened in August of 2015 when the parties separated, and she stated:

He - - last week of August, he was very - - with me. He hit me a number of times. He threw a chair on me, he threw a chair on me in the last week of August, and he - - he hit me very badly that week. Then in 28 of August, he left home with his father, and on 29th or 30th, they came, they all came. They took all his belongings and on the 2nd - - on 2nd of September, they came back again, his mother, he, they all came back and they said - - he said he has canceled the lease, he has broke the lease so you

13

have to leave this apartment and you go to some one bedroom apartment. I said I will not leave this apartment. Then he just show me his big eyes and said, if you will not leave this apartment, then you will have to pay the rent and food. I said, I be - - how I will pay? Then he said, ask your father for the rent and food, and then he - - then he - - then I - - I said, I don't have any money to go to the eye doctor. I was - - I was having an eye problem. Then he smiled. He smiled and they left. And he said, I will ruin your life, I will show what I am.

Wife testified that some of the assaults happened in front of the Child or Husband's father. Husband's father did not assist Wife. Wife testified that Husband had stated: "I will kill you and your family, I will kill you and your family . . . ." Wife testified that she "thought it wasn't safe . . . ," and in September she went to the police about Husband's conduct. At that time, Wife had $27 in her account, about $70 or $80 in cash, and a credit card with a limit of $600.

When Wife left the parties' apartment, she and the Child went to stay with a family friend in Ohio. They stayed in Ohio for a month. Wife was asked what she took when she left the apartment, and she stated: "Nothing. I had only my purse with me." Wife texted Husband from Ohio telling him she needed the Child's birth certificate to enroll the Child in school, and Husband texted back a photo of a temporary restraining order he had obtained. Wife returned to Tennessee on October 4, 2015. The parties then agreed to a temporary parenting plan.

Wife was asked how many times she has lived on her own during her lifetime, and she stated: "I never have been. I was with my parents early; after marriage, I was living with him." Wife explained that she was 28 years old at the time of the marriage and had lived with her parents her entire life.

Wife has a Master's in computer science, and she worked in India as a teacher teaching basic computer knowledge to kids from 2005 through the date of the marriage in December of 2006. Wife did not work from 2007 to 2014.

Wife was questioned about the job she held in 2014, and she testified that she worked in an Indian warehouse. She stated:

It was an office job where I was taking care of the sales. I was making the invoices, and I was taking care of the purchases also. I was making purchasing orders and bought things, what I was doing. And I was communicating with the clients on the phone. . . . It's a - - it's an Indian

14

store. It's Indian warehouse. It's a warehouse of Indian products, grocery, and I used to - - I was a sales - - like sales person there.

The clients were Indian store owners. Wife made $10 per hour and earned approximately $14,000 that year. Her salary was used to send the Child to private school, pay for the Child's tutoring, and pay for groceries. Wife was employed for approximately one year, and then the parties moved because Husband got transferred to Kentucky.

When asked if she had done anything to obtain a job since the filing of the divorce, Wife stated:

> Yes. In - - in December, I joined a - - I - - I called a recruiter and they - - I paid them fees, $500. They said they will help me get in a job also and they will prepare me also for the job, and the training went for two months and - - and then they were - - they just - - well, practical, like practical. They involve very practical knowledge. I was looking for a practical knowledge but they are not providing practical knowledge. . . . The training was in quality assurance testing, and they - - for what they teach us, teach me, there were seven other people in the - - all the training. They were teaching us practical part of the QA testing and the practical part was very little, not up to the - - where we need to be, the - - the - - we need to go for a job, like I can say that I can work, it's not up to that.

Wife stated that she also:

> took the subscription of - - with me. . . . It's called You and Me. You need the online courses that you can pay and buy them, and you can see them throughout your life. So I buy those and I start - - I watched - - watched those videos and - - and I - - I prepared for the interview. I did my best to prepare for them by August, and then I started applying in IT jobs but I - - I applied in a number of IT jobs but only HC Company, they didn't like that.

Wife testified that she also applied to two other companies, but could not remember the names of those companies. She also applied for a secretarial position with the Tennessee government and for another position with the government. Wife testified that for one of those government jobs she received an email telling her that the position already had been filled and for the other she was told she was not qualified. Wife had one interview, but did not get the job. Wife also applied at Macy's. Macy's interviewed Wife and told her she would need to work the night shift and weekends. Wife stated that she cannot work these shifts because of the Child.

Wife attempted to obtain financial aid to attend classes at Columbia State Community College, but was told that on the basis of her tax return she could obtain a loan but not a scholarship.  Wife did not take the loan because she could not repay it.  Wife testified that the class she wanted to take cost $4,000.  She was asked why she wanted to take this class, and she stated:

> Actually, my - - I did my college masters in 2004 and there's a gap of 13 years.  If I go for the employment, then they - - when they see the gap, they just - - they - - because they all seen the gap, they don't like it.  So I just want to put the one certification on my resume so - - so that it will be picked up, my information will be picked up.

If Wife takes the class she expects to be able make $10 per hour.  If she is able to obtain an IT job, Wife thinks she could make "anywhere from $15 to $20, $22" per hour.  Wife testified that she needs to have her transcripts from India translated into English and evaluated in order to attend college.

Wife was asked if she wants to work in the IT field, and she stated: "Yes, I do. . . . The IT, I want to go learn software testing, and I want to go in that field also.  I will try my best - - . . .  for first year."  Wife did some training in 2009 to be a quality assurance tester, but the training was not completed because the instructor left.  Wife completed 18 or 20 hours of training.  Wife testified that she would like to receive training to become a quality assurance tester.  She never has worked in that field and so does not know how to do documentation.  When questioned, Wife admitted that she now could do a basic quality assurance job.

After the parties separated, Wife borrowed $9,900 from Babeek Sharma, the son of one of her father's friends, in installments in approximately March, May, and November: "Because I was not getting my daily expenditures in March and I left with only $47, then I - - then I - - he helped me by transferring money in my account."  Wife has paid back $4,000.  Wife owes $10,250 to Ahwan Singla, a friend of her father's, who paid her attorney's fees directly to her attorney and who also gave Wife money for clothes and food in September of 2015.  Wife has not paid back any of this loan.

During the pendency of the divorce, Wife looked at the bank statements and learned that Husband had spent about $19,000 on gold and silver.  Wife has none of that gold and silver in her possession.  Wife was gifted jewelry upon the marriage, and Husband's mother now has possession of some of that jewelry.

After trial, the Trial Court entered its detailed Memorandum and Order on May 23, 2017, *inter alia*, awarding Wife a divorce on the ground of inappropriate marital

conduct, finding that Husband had dissipated marital assets, dividing the marital property, awarding Wife rehabilitative alimony and alimony *in futuro*, and entering a Permanent Parenting Plan for the parties' minor child, after finding and holding, *inter alia*:

On June 21, 2016, following an attempt at mediation, Judge Michael W. Binkley, Chancellor, entered an Agreed Order, requiring Husband to distribute to Wife the sum of $12,731.00, characterized as a partial equitable distribution of marital assets. Husband was also ordered to pay to Wife one-half of the parties' 2015 federal individual income tax refund within three days of Husband's receipt of the refund. Husband received the Parties' income tax refund in the total amount of $3,552.00, but did not remit any portion of Wife's one-half share ($1,776.00) until ordered to do so in open court on April 21, 2017.

On October 13, 2016 Wife filed a Motion seeking sanctions against Husband for discovery abuses, as well as failure to comply with the Court's Order of July 15, 2016. This Motion for Sanctions was heard the morning of trial. This Court granted Wife partial relief for Husband's failure to comply with discovery by excluding Husband's untimely disclosed contemplated expert witnesses from testifying. The Court also ordered Husband to remit Wife's share of the 2015 income tax refund.

## DISCUSSION

### A. Findings of Fact

This is an arranged marriage of eleven (11) years duration. The parties were introduced to each other in early December 2006 through their respective extended families and were married in India on December 14, 2006. At the time of the marriage, Husband was thirty (30) years of age, and had been working in the information technology field in the United States for five years. Husband was born May 11, 1976, in the Indian state of Punjab and is forty-one (41) years old. He is a citizen of the Republic of India, but is an authorized permanent resident alien in the United States. Husband holds the equivalent of a bachelor's degree in physics, and a master's degree in computer science. Husband purports to be in good physical and emotional/mental health.

Wife was born on September 11, 1978 in Punjab and is now thirty-nine (39) years old. She was twenty-eight (28) years old at the time of the arranged marriage to Husband. She also is an Indian citizen and a

permanent resident alien in the United States. She was working in India teaching computer science classes to students, in the Indian school equivalent of 8th through 10th grade, prior to her move to the United States. She holds a bachelor's and master's degree in computer science by Indian universities. Wife was diagnosed several years ago with hypothyroidism, for which condition she takes a daily dose of synthetic thyroid hormone. Apart from occasional fatigue, Wife reports no acute symptoms associated with this condition. Wife also sought and received treatment for situational depression shortly after Husband filed for divorce. She was prescribed a 90-day course of anti-depressant medication, which she completed. Through exercise and mental health counseling, Wife believes she no longer needs medication for depression and has not refilled the earlier prescription.

Husband and Wife have one child (hereinafter referred to as Child), . . . born in the United States. At the time of trial, Child is about to complete her second grade year . . . [of school].

In January 2007, Wife resigned her teaching position in India and migrated to the United States in order to be with Husband. The parties initially made their marital home in Lake Forrest, California. Wife was granted a United States work permit in October 2007, but at Husband's request, Wife eschewed employment for a time in order to devote herself to family life and her role as Husband's spouse.

Child was born while the parties lived in California. Husband devoted his energies toward generating income through employment, while Wife invested her time in caring for Child and making a home for the family. Although Husband did, from time to time, care for Child's needs, Wife performed the vast majority of day-to-day child care and supervision.

In 2012, Wife took a two-month trip to India with Child, so that Child could meet her maternal grandparents and other members of Wife's extended family. Wife and Child returned from India to the United States where they resumed living with Husband in the apartment Husband had rented for the marital residence.

In 2013, Wife again planned such a trip to India. The trip was motivated, in part, by a report Wife received from one of her sisters in India to the effect that Wife's father was ill. This time, however, Husband objected to Child accompanying Wife and insisted Wife travel to India

18

without Child. He told Wife that his parents, who had come to live with the parties in the United States, would be available to take care of Child during the day while he worked.

Husband had Child's passport in his possession and refused to give it to Wife in order for Child to fly with Wife to India. Because of Husband's insistence that Child remain in the United States, Wife departed alone for India in late March 2013. While she was in India, Wife attempted to stay in touch with Child through telephone and video calls, but with varying success. Wife became concerned with the increasing gaps of time she was unable to reach Husband by phone or otherwise establish contact with Child.

In early June 2013, Wife informed Husband via voicemail and email she was returning to the United States and then also provided Husband with detailed flight arrival information. When Wife's flight arrived in Los Angeles, neither Husband, his parents, nor anyone else was present to meet her. Wife arranged taxi transportation to the apartment she and Husband maintained as their marital residence only to discover Husband had abandoned the marital residence, cancelled the lease, and moved with Child and his parents to a new location.

Wife managed to reach Husband by telephone and he agreed to meet Wife the next day with Child. The next morning, Husband arrived at Wife's location with Child. He turned Child over to Wife and told Wife she was now responsible for providing Child with housing. Wife managed to find accommodations in a boarding house occupied by other young women from India where she and Child remained for several weeks. Wife eventually convinced Husband to allow her and Child to return to a family setting.

Husband filed suit for divorce in California in 2013, but dismissed the divorce action after Wife reunited with him. Shortly after Wife and Child were reunited with Husband, Wife obtained employment in a retail store, India Exports, where she worked until Husband took a new job in Louisville, Kentucky, and the family had to move in early 2014. The family lived in a rental residence in Louisville for approximately six (6) months. During that time, Husband again had a job change that required he move from Louisville to Middle Tennessee. Husband commuted on weekends for several weeks until he found an apartment in Franklin,

Williamson County, Tennessee. In May 2015, Wife and Child again moved to join Husband.

Throughout the marriage, Husband controlled the family finances, and he did so in a manner that was oppressive to Wife. Although Wife had a deposit account in her name, her only source of income, apart from the brief period she was employed at India Exports, was whatever allowance Husband gave her; usually, these amounts were $500 or less per month. Husband's financial control extended to entering into business transactions without informing Wife. Husband formed business entities ostensibly where Wife owned the capital stock or equity membership interest, but where Wife actually had no genuine involvement or participation in the business. In some instances, Wife was completely unaware of Husband's actions. Husband used Wife's name as a straw-man owner as a strategy calculated to insulate Husband from the business' liabilities and claims of creditors. Husband opened a store credit card account at Best Buy in Wife's name. The initial purchase on this account was for a washer and dryer. Thereafter, Husband held onto the card and used the account for his personal purchases without consulting Wife. He also engaged in numerous foreign currency transactions, whereby he would wire substantial sums of dollars through ICICI Bank in India for conversion to rupees. These rupees would then be deposited into an account at Citi Bank in India in his mother's name, which she would hold for Husband's benefit. Husband took out loans from family members and other related parties without Wife's knowledge or consent. In discovery and at trial, Husband failed to credibly account for these loan transactions. Husband also borrowed $43,600.00 from the vested balance of his 401(k) retirement savings which he claims to have used in connection with the purchase of a new BMW automobile. This was also done[2] without Wife's knowledge or consent and done solely for Husband's enjoyment.[3] Husband also paid generous amounts each month to his parents and brought his parents to the United States to live in the marital home with Wife and Child.

Additionally, Husband was emotionally and physically abusive towards Wife, and on occasion, towards Child. Wife testified Husband's anger and hostility towards her was triggered by Husband discovering Wife did not own an interest in certain real estate holdings in India belonging to

---

[2] Husband offered contradictory testimony on the subject of the purpose for this 401(k) loan. The Court's finding is based upon Husband's entire testimony on this topic.

[3] This car purchase was also unnecessary inasmuch as Husband already had a car for his exclusive use.

her father and sisters. Wife believes Husband had a misimpression of Wife's financial status at the time of the arranged marriage.

Husband habitually made recordings of telephone conversations between Wife and Wife's parents or sister. Husband would frequently become inappropriately angry when frustrated or when Wife failed to meet his housekeeping or child care expectations. Husband denigrated Wife verbally, calling her "zero person," "daughter of a donkey," and "bitch."[4] When he was angry, Husband would slap Wife, pull her hair, squeeze her face with his hands, push her, pull her by the nose, twist her arm behind her back, strike her on the head, and pull her by her ear lobes. These assaults were painful to Wife and occasionally left marks on her body or caused her to bleed, as when he pulled her ear lobe causing an abrasion with her earring.

At trial, Wife testified to all of the foregoing and Husband denied this verbal and physical abuse in his trial testimony. The Court credits Wife's testimony and finds Husband's denials to be unworthy of belief. Wife's emotional affect and general demeanor while testifying were consistent with truthfulness. Wife withstood a careful and searching cross examination without impeachment. Wife's testimony was direct, responsive, rich in detail, consistent, and coherent. Husband's emotional affect and general demeanor while testifying were not consistent with truthfulness. Husband was impeached repeatedly with his prior deposition testimony wherein he acknowledged having been verbally abusive and attempted to justify his conduct with self-serving rationalizations predicated upon a patriarchal paradigm of marriage. Moreover, Husband was evasive and argumentative when answering questions on cross-examination as well as questions posed by the Court. His credibility was further diminished by his repeated failures to provide reliable information in discovery.

Husband attempted to bolster his credibility by offering the testimony of his father, Jaresh [sic] Singla, who testified he lived in the marital home for a number of years, and claimed to never to [sic] have witnessed his son commit any physical abuse. On cross-examination, the elder Mr. Singla was shown to be biased in favor of his son. He also has an economic interest in buttressing his son's testimony, inasmuch as the elder Mr. Singla and Husband have intertwined family business ventures, the younger Mr. Singla financially supports his parents, and provides them with

---

[4] In their conversations at home, Husband and Wife spoke Hindi to each other.

housing in the United States. When questioned on cross-examination whether he had ever witnessed Husband address Wife in demeaning terms, the elder Mr. Singla testified he witnessed "some quarrelling" between the parties. To the extent the elder Mr. Singla's testimony was offered to corroborate Husband's implausible denials, the Court gives such testimony little weight.

Wife, with Child, lived with Husband and Husband's parents, in a two-bedroom apartment in Franklin, Tennessee from May 2015 until August 28, 2015 when Husband and his parents left the apartment to stay in a hotel. On September 2, 2015, Husband told Wife he had cancelled the lease on the apartment and that she would be responsible for paying the lease going forward. He also told her that if she could not afford the rent on the apartment, she would have to find other accommodations. On September 4, 2015, Husband again told Wife either she or her family would have to pay the rent on the marital apartment or else she would have to vacate. Husband and Wife argued. Wife repeatedly stated she had no means of paying the rent. Husband became increasingly angry, culminating in Husband saying "I will kill you and your family" or words to that effect.

When Husband left the apartment, Wife took Child and drove to the Franklin Police Department where she reported Husband's behavior. A police officer took her report and asked Wife if she wanted Husband arrested. Wife told the officer she did not want Husband arrested and the officer advised Wife to go to a domestic abuse shelter.

Being unemployed and depending entirely on Husband for family support, Wife was faced with what she plausibly believed to be the prospect of eviction for nonpayment of rent. Therefore, Wife arranged to obtain living accommodations for herself and Child, with the extended family of her father's friend. This person lived in Cincinnati, Ohio. On September 11, 2015, Wife left Tennessee and drove with Child to Ohio. The next day, Husband discovered Wife had left the Parties' apartment. He and his parents checked out of the hotel where they had stayed for several days, and moved back into the apartment, where Husband and his parents remain to date.

Meanwhile, Wife was in Ohio and relying on the generosity of her father and extended family members for support. On September 17, 2015, Wife sent a text message to Husband asking for Child's birth certificate in order to enroll Child in public school. Husband did not reply until

22

September 21, 2015, when he texted to Wife a photograph of the first page of an *ex parte* restraining order Husband had obtained against Wife.

On October 4, 2015, Wife returned to Franklin, Tennessee with Child. She used some of the funds made available to her by her father and his friends to lease a one-bedroom apartment for herself and Child. The *ex parte* restraining order was dissolved, and the parties entered into a temporary parenting plan on October 6, 2015, naming Wife as primary residential parent and giving Husband visitation on alternate weekends from Thursday afternoon until Monday morning.

Currently, Wife and Child live in a one-bedroom apartment . . . in Franklin, Tennessee. What furniture Wife has in this apartment was acquired after the parties' separation. Child is . . . currently in the second grade for the 2016-2017 academic year. . . .

Wife frequently allows Husband extended and additional parenting time when he requests it. Notwithstanding Wife's accommodations to Husband, he does not keep her informed of his parenting activities with Child and is not prompt in returning Child to Wife at the end of his scheduled parenting time. In January 2016, without informing Wife, Husband took Child to visit Husband's extended family in Virginia. Wife learned of this out-of-state trip only after she went to the customary pick-up point and Husband did not show up to drop off Child as planned.

\* \* \*

The only closely held business interests offered into evidence are Globus Trends, LLC, and JS Exports. Husband claims each of these business entities are Wife's property since the capital stock or membership interest is ostensibly in her name. The Court finds, however, Wife was used by Husband as a straw-man owner, without Wife's knowledge or consent, in an attempt to create a shelter of his personal assets from claims of creditors. In any event, both businesses failed and at the time of trial have no value.

\* \* \*

Wife contends Husband dissipated $128,149.00 by imprudent investments and transfers to his parents. Husband insists the transfers to his parents

served a marital purpose because, according to Indian culture, he owes a familial support obligation to his parents.

From the entire testimony, the Court finds Husband dissipated marital assets as follows: (i) $23,505.00 in imprudent and oppressive investments; (ii) $45,000.00 in transfers to his parents for their support; (iii) $12,010.00 down payment towards purchase of BMW; (iv) $16,000.00 in transfers to Sapna Singla for non-marital purposes. The total of these dissipating transactions is **$96,515.00**. In addition, Husband transferred $36,000.00 through ICICI Bank where the dollar denominated transfer was converted to Indian rupees and further deposited in an account with Citi Bank in India in Husband's mother's name. Husband's mother is holding this account for Husband's benefit. The Court finds the purpose of these transfers was to conceal marital assets and attempt to remove them from this Court's jurisdiction. During the trial, the Court orally ordered Husband to cause these funds held by his mother in India transferred to the custody of the Clerk & Master for safekeeping pending the final disposition of this case.

* * *

Both Husband and Wife are well educated as each holds a graduate degree in computer science granted by a university in India. Husband has a demonstrated track-record of gainful employment in the information technology ("IT") field in the United States, and Wife worked in India, teaching computer science to students in the Indian equivalent of middle school. She left this occupation after the marriage in order to join Husband in the United States and she has not worked in the IT field since then. Except for a brief retail sales job, Wife has not been employed outside the home since the marriage. Wife's facility with the English language is very good in writing, but very poor in oral communication. Before Wife could be gainfully employed in any occupation, she would need to receive additional training in English communication skills. Neither party made a tangible or intangible contribution to the others' education, training, or increased earning power.

Husband has a far greater capacity to acquire capital assets and income in the future than Wife. Per Husband's wishes, Wife devoted her energies almost exclusively in her role as Wife and homemaker while Husband devoted his energies and efforts to earning income. Husband dissipated marital assets through imprudent and oppressive business

24

decisions as well as through transactions calculated to disguise and conceal assets. Husband's wrongful conduct continued throughout the time this case was pending and included the failure or refusal to meet his obligations to provide truthful and timely responses to Wife's legitimate discovery requests.

Husband's separate property consists principally of undivided fractional interests in Indian real estate with a value of $8,900.00. Wife's separate property consists of jewelry gifted to her at the time of the marriage with a value of $16,716.00. At the time of the marriage, the parties' estates were of negligible value.

Wife is clearly an economically disadvantaged party. She has not worked in her chosen field of IT for a decade; due to the progressive nature of this field, Wife will require additional formal education in order to update her knowledge base. Moreover, she will require additional education to improve her ability to communicate in English. Contrarily, Husband has been able to earn a six-figure income in the IT field for the duration of the marriage. There is no evidence his earning capacity will be diminished following the divorce.

* * *

Wife candidly admitted she had a period of adjustment and situational depression as a result of this litigation, and that she in fact had been prescribed antidepressant medication, but that she no longer needed the medication after the adjustment to being separated. Wife admitted she still loves her Husband, and mourns the loss of the marriage, despite a contentious divorce and trial. Contrarily, Husband demonstrated issues with anger management, impulse control, and a need for disproportionate control and dominance in the relationship. The Court finds Husband lacks a commitment to candor and transparency in the way he dealt with Wife during the marriage. His use of her as a straw-man owner of closely held businesses was dishonest and oppressive. . . .

* * *

Husband has the ability to earn a six-figure income. Husband's current earning capacity is $140,000.00 and Husband made $137,000.00 in 2016. (Ex. 5). It is undisputed Husband provided temporary family support to Wife in the amount of $1,700.00 per month from October of

25

2015 to July of 2016, at which time the temporary support was increased to $2,000.00 per month. Husband has also continued to support his own parents, which includes $1,200.00 to $1,500.00 per month according to the testimony of the elder Mr. Singla.

Wife is presently unemployed. For the duration of the marriage, Wife was financially dependent upon Husband. Wife has looked for employment, but has been unsuccessful. It was clear based upon the testimony of the witnesses that Wife has some obstacles to overcome when engaging in the work force in the United States. Wife has significant formal education, including a graduate degree in computer science, but due to her decade-long absence from the IT workforce and limitations in her language skills, she requires substantial rehabilitation before she can maximize her earning potential in the United States. Further, Wife's communication skills are limited and a great deal of work will be required in order for Wife to assimilate into the work force for her to earn what she hopes to earn.[5] Notably, she is not voluntarily unemployed. Wife has identified suitable relevant educational opportunities offered at the Franklin campus of Columbia State Community College. Based upon the exhibits received into evidence and testimony of the parties, it is clear both parties agree Wife is in need of alimony.

This is an eleven (11) year arranged marriage. Husband and Wife are in good physical health. Although Wife experienced a period of situational depression during the stress of the divorce, she has recovered and no longer takes any medication for depression.

It is evident that Wife will be the primary residential parent of Child and she does not have any family members to assist her, living in the United States. Therefore, it will be undesirable for Wife to seek employment for which the hours would not accommodate care for the child when she is not in school. Accordingly, Wife will have to seek employment with a traditional Monday through Friday work schedule.

After careful review of Wife's income and expense statement, (Ex. 32), the court finds that: (1) Wife's request for the reasonable expense of $1,450.00 in rent for a two-bedroom apartment would be appropriate; (2) all Wife's proposed utility expenses are reasonable and appropriate; (3) all of Wife's car operation expenses are reasonable; (4) all of the installment

---

[5] The parties communicated with one another in Hindi and Punjabi during the marriage, and those are Wife's primary languages.

contracts and monthly bills are reasonable; and (5) in regards to "other expenses," the Court finds all of Wife's contemplated expenses are necessary and reasonable. These anticipated expenses do not include Child's tutoring, the credit card bills the court has ordered the Husband to pay, and Wife's legal expenses. The Court further finds that once Wife obtains a two-bedroom apartment, and the additional expenses that go along with that apartment, her reasonable monthly expenses will be $4,841.00. Wife has agreed that her current income should be imputed at $1,257.00, and based upon the income shares worksheet, Wife will be receiving $1,127.00 in child support; therefore, leaving Wife with a shortage of $2,457.00 per month. Further, the Court finds after the division of marital assets, both parties will have very limited retirement savings plans and Husband will be in a better position to accommodate future retirement savings than Wife.

The Court finds that it is clear that both parties are educated with graduate degrees in the IT field. Husband is not seeking and does not currently need any future education and training. He is working in his chosen profession, and earning a six-figure income. Although she has a similar education, it is clear that Wife's education is outdated in a field that is ever-changing. Further, it is apparent that Wife has attempted to obtain other employment since the separation of the parties in 2015 and has been unable to secure a job. She has applied at many retail jobs and government jobs, all to no avail. Wife has attempted to apply to Columbia State Community College, in order to improve her skills and training in hopes of obtaining an "IT job" to improve her earning capacity. Wife testified without contradiction, she needs a lump sum of approximately $4,200.00 to enroll in classes at Columbia State Community College and to have her transcript sent to the school from India.

The Court finds that the parties, for numerous reasons, do not have significant real or personal separate assets. The Court finds that this marital estate has a total gross asset value, including an adjustment for Husband's dissipation of assets of $278,749.00 and that after division, Husband will be awarded $153,635.00 and Wife will be awarded $125,124.00.

The parties' standard of living is depends [sic] upon Husband's income of approximately $140,000.00 per year. The Court does not find the parties' lifestyle is extravagant, but rather a reasonable standard of living, based upon the amount of Husband's income. Because of the limiting factor of Wife's language skills and her educational needs, Wife

would not be able on her own to obtain the standard of living established during the marriage. Wife credibly testified, and the Court therefore finds, she could earn approximately $20.00 per hour after full rehabilitation and after she has gained five (5) to seven (7) years of experience in the IT field. This weighs in favor of an award of rehabilitative alimony as well as an amount of alimony *in futuro*.

Wife gave up a teaching career and relocated from India to Los Angeles for this marriage. She obtained a retail sales job - the only job she had during the marriage – in the Los Angeles area and had to leave that job due to Husband's relocation to Louisville, Kentucky. Wife did not work while the parties lived in Louisville. She relocated again for Husband's career to Franklin, Tennessee. Wife has made contributions as a mother and homemaker equal to or exceeding those of Husband, and has indirectly contributed to Husband's increased earning capacity. Husband has also substantially contributed with his earning and monetary contributions. However, this contribution is partially offset by Husband's dissipation of marital assets.

The Court finds that Husband is clearly at fault in dissipating marital assets and has engaged in inappropriate conduct by controlling and oppressing Wife. Husband's actions left Wife uninformed about the family's finances. Further, Husband's degradation of Wife, treating her as a "zero person" and treating her as less than an equal to him has clearly impaired her confidence to reenter the workforce.

\* \* \*

Husband concedes that Wife needs rehabilitative alimony but disputes the length of time required for Wife's rehabilitation. Husband argues alimony should be paid for only a few years. Wife has proved, however, she can only be partially rehabilitated for employment in the United States and is requesting rehabilitative alimony for seven (7) years, together with an award of alimony *in future* [sic]. Based upon Wife's inability to be fully rehabilitated, she will not be able to achieve the earning capacity of Husband nor to achieve the standard of living experienced during the marriage. Therefore, the Court finds Wife is an appropriate candidate for alimony *in futuro*. The economic disadvantage existing between Wife and Husband both throughout and after the marriage will persist, even after reasonably foreseeable rehabilitation. At her best, Wife is never likely to achieve the same degree of success in the IT field enjoyed

by Husband, if for no other reason, because he has more than a decade of work experience. In comparison, Wife lost her opportunity to gain IT experience while she was staying at home, caring for Child and trying to be the traditional Indian wife Husband expected her to be.

Based upon a careful consideration and weighing all of the foregoing facts, circumstances, and factors, it is clear, Wife will need approximately $2,500.00 of spousal support per month in addition to her imputed income of minimum wage and Husband's child support obligation in the amount of $1,127.00. The Court finds that Wife will be able to partially rehabilitate herself through her proposed plan and education to the point that she can earn approximately $20.00 per hour. The Court accepts Wife's testimony and finds it will take Wife approximately five (5) to seven (7) years to achieve her maximum possible rehabilitation.

* * *

The facts of this case support an award of alimony *in futuro*. Wife had no or very little earning history during the marriage; she worked during one (1) year of the marriage making approximately minimum wage; prior to the parties' marriage Wife was earning income using her education teaching in the IT field at a secondary school in India; this marriage was an arranged marriage; Wife relocated no less than four (4) times during the course of the marriage including immigration to the United States; Wife's communication skills are limited as her first languages are Hindi and Punjabi; her education is in a field that has rapidly changed since she completed her formal education; and Husband's degrading treatment of Wife during the marriage as a "zero person" has hindered her ability to reenter the workforce.

The Court hereby grants Wife's request for rehabilitative alimony in the amount of $1,500.00 per month for a period of eighty-four (84) months, beginning on the first day of June, 2017, and continuing for eighty-three (83) months thereafter. Additionally, the Court finds that Wife can only be partially rehabilitated and further awards Wife $1,000.00 per month in alimony *in futuro*. Additionally, the Court awards Wife alimony *in solido* in the amount of $4,200.00 for the purpose of tuition at Columbia State Community College.

* * *

29

Husband made materially misleading and incomplete statements in response to interrogatories, and failed to produce documents in response to Rule 34 requests, and provided evasive deposition testimony, none of which discovery abuses were cured in the course of this divorce proceeding. Further, the Court finds that Husband's actions were calculated to withhold and/or disguise information and his actions clearly, escalated this matter and caused Wife to incur a great deal of attorney's fees. The Court expressly finds Husband's conduct during the course of this case has been oppressive to Wife and has unnecessarily increased the expense of this litigation. Husband was not forthcoming with candid and complete answers to legitimate discovery requests. He made statements in the course of discovery that were misleading, incomplete, and untruthful. Husband attempted to hide assets and engaged in currency transactions and business arrangements deliberately opaque and calculated to disguise his assets.

(footnotes in original but renumbered; some footnotes omitted). Husband appeals the Trial Court's order to this Court.

## Discussion

Although not stated exactly as such, Husband raises three issues on appeal: 1) whether the Trial Court erred in awarding Wife alimony *in futuro* of $1,000 per month in addition to seven years of rehabilitative alimony; 2) whether the Trial Court erred in finding that Husband dissipated marital assets; and, 3) whether the Trial Court equitably distributed the marital property in light of the alleged errors of awarding alimony *in futuro* and finding dissipation of marital assets. Wife raises a separate issue regarding whether she is entitled to an award of attorney's fees on appeal.

Our review is de novo upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014). A trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Kelly v. Kelly*, 445 S.W.3d at 692.

We first consider whether the Trial Court erred in awarding Wife alimony *in futuro* of $1,000 per month in addition to seven years of rehabilitative alimony. As our Supreme Court has instructed:

> For well over a century, Tennessee law has recognized that trial courts should be accorded wide discretion in determining matters of spousal

support. *See Robinson v. Robinson*, 26 Tenn. (7 Hum.) 440, 443 (1846) ("Upon a divorce . . . the wife is entitled to a fair portion of her husband's estate for her support, and the amount thus to be appropriated is a matter within the legal discretion of the chancellor. . . ."). This well-established principle still holds true today, with this Court repeatedly and recently observing that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award. *See, e.g., Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004); *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001); *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000).

Equally well-established is the proposition that a trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. *Kinard v. Kinard*, 986 S.W.2d 220, 235 (Tenn. Ct. App. 1998); *see also Burlew*, 40 S.W.3d at 470; *Robertson v. Robertson*, 76 S.W.3d 337, 340–41 (Tenn. 2002). As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." *Kinard*, 986 S.W.2d at 234. Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. *Robertson*, 76 S.W.3d at 343. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010). This standard does not permit an appellate court to substitute its judgment for that of the trial court, but " 'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.' " *Henderson*, 318 S.W.3d at 335 (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision. *Wright*, 337 S.W.3d at 176; *Henderson*, 318 S.W.3d at 335.

\* \* \*

Current Tennessee law recognizes several distinct types of spousal support, including (1) alimony in futuro, (2) alimony in solido, (3) rehabilitative alimony, and (4) transitional alimony. Tenn. Code Ann. § 36–5–121(d)(1). In analyzing the present dispute, it is helpful to begin with an overview of each type.

The first type of spousal support, alimony in futuro, is intended to provide support on a long-term basis until the death or remarriage of the recipient. Tenn. Code Ann. § 36–5–121(f)(1). This type of alimony can be awarded where "the court finds that there is relative economic disadvantage and that rehabilitation is not feasible." *Id. See also Burlew*, 40 S.W.3d at 470–71; *Riggs v. Riggs*, 250 S.W.3d 453, 456 n.2 (Tenn. Ct. App. 2007). Alimony in futuro is appropriate when

> the disadvantaged spouse is unable to achieve, with reasonable effort, an earning capacity that will permit the spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse.

Tenn. Code Ann. § 36–5–121(f)(1).

Alimony in futuro "is not, however, a guarantee that the recipient spouse will forever be able to enjoy a lifestyle equal to that of the obligor spouse." *Riggs*, 250 S.W.3d at 456 n.2. In many instances, the parties' assets and incomes simply will not permit them to achieve the same standard of living after the divorce as they enjoyed during the marriage. *Robertson*, 76 S.W.3d at 340. While enabling the spouse with less income "to maintain the pre-divorce lifestyle is a laudable goal," the reality is that "[t]wo persons living separately incur more expenses than two persons living together." *Kinard*, 986 S.W.2d at 234. "Thus, in most divorce cases it is unlikely that both parties will be able to maintain their pre-divorce lifestyle. . . ." *Id.* It is not surprising, therefore, that "[t]he prior concept of alimony as lifelong support enabling the disadvantaged spouse to maintain the standard of living established during the marriage has been superseded by the legislature's establishment of a preference for rehabilitative alimony." *Robertson*, 76 S.W.3d at 340.

* * *

     In contrast to alimony in futuro, rehabilitative alimony is intended to assist an economically disadvantaged spouse in acquiring additional education or training which will enable the spouse to achieve a standard of living comparable to the standard of living that existed during the marriage or the post-divorce standard of living expected to be available to the other spouse. *See* Tenn. Code Ann. § 36–5–121(e)(1). *See also Robertson*, 76 S.W.3d at 340–41; *Riggs*, 250 S.W.3d at 456 n.4. Rehabilitative alimony thus serves the purpose of assisting the disadvantaged spouse in obtaining additional education, job skills, or training, as a way of becoming more self-sufficient following the divorce. *Robertson*, 76 S.W.3d at 340–41; *Isbell v. Isbell*, 816 S.W.2d 735, 738–39 (Tenn. 1991). This purpose is markedly different than the purpose of alimony in futuro, which is to provide long-term support when the economically disadvantaged spouse is unable to achieve self-sufficiency. *Kinard*, 986 S.W.2d at 234.

* * *

     The statutory framework for spousal support reflects a legislative preference favoring short-term spousal support over long-term spousal support, with the aim being to rehabilitate a spouse who is economically disadvantaged relative to the other spouse and achieve self-sufficiency where possible. *See* Tenn. Code Ann § 36–5–121(d)(2)–(3); *Bratton*, 136 S.W.3d at 605; *Perry v. Perry*, 114 S.W.3d 465, 467 (Tenn. 2003). Thus, there is a statutory bias toward awarding transitional or rehabilitative alimony over alimony in solido or in futuro. While this statutory preference does not entirely displace long-term spousal support, alimony in futuro should be awarded only when the court finds that economic rehabilitation is not feasible and long-term support is necessary. *See Bratton*, 136 S.W.3d at 605; *Robertson*, 76 S.W.3d at 341–42.

     Finally, in determining whether to award spousal support and, if so, determining the nature, amount, length, and manner of payment, courts consider several factors:

> (1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

33

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36–4–121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36–5–121(i). Although each of these factors must be considered when relevant to the parties' circumstances, "the two that are considered the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay." *Riggs*, 250 S.W.3d at 457. *See also Bratton*, 136 S.W.3d at 605; *Robertson*, 76 S.W.3d at 342; *Burlew*, 40 S.W.3d at 470. Carefully adhering to the statutory framework for awarding spousal support, both in terms of awarding the correct type of support and for an appropriate amount and time, fulfills not only the statutory directives but also alimony's fundamental purpose of eliminating spousal dependency where possible.

34

*Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105-11 (Tenn. 2011) (footnote omitted).

Husband argues in his brief on appeal that the Trial Court incorrectly applied a standard of "exact equivalence" when it determined that Wife is unable to be fully rehabilitated. Husband is mistaken. The Trial Court carefully considered the relevant statutory factors in light of the evidence presented and determined that Wife will be "unable to achieve, with reasonable effort, an earning capacity that will permit [Wife's] standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to [Husband] . . . ." Tenn. Code Ann. § 36-5-121(f)(1) (2017). We need not reiterate the evidence presented, which supports the Trial Court's finding, as it is discussed fully above. This is especially so given the Trial Court's credibility determinations as to Husband and Wife. We do not find that the Trial Court applied an incorrect standard when making its determination regarding alimony.

Husband also argues in his brief on appeal that this case is analogous to *Gorashi-Bajestani v. Bajestani*, wherein this Court vacated an award of alimony *in futuro*. *Gorashi-Bajestani v. Bajestani*, No. E2009-01585-COA-R3-CV, 2010 WL 3323743, *17 (Tenn. Ct. App. Aug. 24, 2010), *no. appl. perm. appeal filed*. Husband asserts that in *Gorashi-Bajestani* this Court "recognized that the wife's educational background (equivalent to her husband's), combined with her age, good health, and multi-lingual status rendered an award of alimony *in futuro* arising from an eight-year marriage an abuse of discretion," and that in the case now before us on appeal "Wife was in her late thirties at the time of trial, enjoyed good health and multi-lingual status, and holds a master's degree in computer science, just as Husband does."

The case now before us on appeal, however, is distinguishable from *Gorashi-Bajestani*. For starters, the wife in *Gorashi-Bajestani* was not simply multi-lingual, one of the languages she spoke fluently was English. *Gorashi-Bajestani*, 2010 WL 3323743 at *1. In the case now before us on appeal, while Wife speaks fluent Hindi and Punjabi, the Trial Court found that Wife's oral communication skills in English were "very poor," and that Wife would need additional training in English in order to obtain a job in her chosen field. The evidence in the record on appeal does not preponderate against this finding. Even Husband admitted when pressed that Wife will need further skill training in English. Furthermore, in *Gorashi-Bajestani*, the wife was a licensed engineer who had obtained her engineering degree in the United States and had worked within her chosen field within the United States prior to the birth of her children. *Gorashi-Bajestani*, 2010 WL 3323743 at *1. In the case now before us on appeal, Wife has a degree in computer science, which she obtained from a university in India, and never has worked within the United States in her chosen field. Additionally, the Trial Court noted that "[Wife's] education is in a field that has rapidly changed since she completed her formal education .

. . .," in contrast to the chosen field of the wife in *Gorashi-Bajestani*. In addition to all of the foregoing, the wife in *Gorashi-Bajestani* received almost $2.6 million of the marital property in the distribution whereas in the case now before us on appeal Wife received only $125,124.00. *Gorashi-Bajestani*, 2010 WL 3323743 at * 17. We do not find the case now before us on appeal to be analogous to *Gorashi-Bajestani*.

The Trial Court considered the relevant statutory factors in light of the evidence presented to it, as discussed more fully above, and made detailed and thorough findings. The evidence does not preponderate against the Trial Court's findings. We find no error in the Trial Court's award of alimony *in futuro* of $1,000 per month in addition to seven years of rehabilitative alimony.

We next consider whether the Trial Court erred in finding that Husband dissipated marital assets. As our Supreme Court has instructed:

> Whether dissipation has occurred depends on the facts of the particular case. 24 Am.Jur.2d Divorce and Separation § 526 (2009). The party alleging dissipation carries the initial burden of production and the burden of persuasion at trial. *Burden v. Burden*, 250 S.W.3d 899, 919 (Tenn. Ct. App. 2007), *perm. to app. denied*, (Tenn. Feb. 25, 2008). Dissipation of marital property occurs when one spouse wastes marital property and thereby reduces the marital property available for equitable distribution. *See Altman v. Altman*, 181 S.W.3d 676, 681–82 (Tenn. Ct. App. 2005), *perm. to app. denied*, (Tenn. Oct. 31, 2005). Dissipation "typically refers to the use of funds after a marriage is irretrievably broken," *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006), is made for a purpose unrelated to the marriage, and is often intended to "hide, deplete, or divert" marital property. *Altman*, 181 S.W.3d at 681–82. In determining whether dissipation has occurred, trial courts must distinguish between dissipation and discretionary spending. *Burden*, 250 S.W.3d at 919–20; 24 Am.Jur.2d Divorce and Separation § 526 (2009). Discretionary spending might be ill-advised, but unlike dissipation, discretionary spending is typical of the parties' expenditures throughout the course of the marriage. *Burden*, 250 S.W.3d at 919–20.

*Larsen-Ball v. Ball*, 301 S.W.3d 228, 235 (Tenn. 2010).

With regard to this issue, the Trial Court specifically found, *inter alia*:

Husband dissipated marital assets as follows: (i) $23,505.00 in imprudent and oppressive investments; (ii) $45,000.00 in transfers to his parents for

36

their support; (iii) $12,010.00 down payment towards purchase of BMW; (iv) $16,000.00 in transfers to Sapna Singla for non-marital purposes. The total of these dissipating transactions is **$96,515.00**. In addition, Husband transferred $36,000.00 through ICICI Bank where the dollar denominated transfer was converted to Indian rupees and further deposited in an account with Citi Bank in India in Husband's mother's name.

With regard to the investments, we do not find that the investments, even though imprudent in hindsight, constituted dissipation as sometimes people make what look to be imprudent investments that wind up paying off. Husband made some bad business decisions. However, as Wife would have shared, in the divorce at least, the gains if those investments had paid off, so should she share in the poor results. We, therefore, vacate the finding that Husband dissipated $23,505.00 in imprudent and oppressive investments.

The evidence in the record on appeal, however, does support the Trial Court's findings that Husband dissipated significant marital assets in other ways as found by the Trial Court. The evidence in the record, as discussed more fully above, supports a finding that Husband dissipated $73,010 in marital assets. We affirm the finding that Husband dissipated these marital assets.

Next, we consider whether the Trial Court equitably distributed the marital property in light of the alleged errors of awarding alimony *in futuro* and finding dissipation of marital assets. As discussed fully above, we find no error in the awards of alimony, and although we vacate the finding that Husband had dissipated some of the marital assets in business investments, we affirm the finding that Husband had dissipated $73,010 in marital assets. The Trial Court correctly considered the relevant factors contained in Tenn. Code Ann. § 36-4-121 in light of the evidence presented to it as discussed fully above. The finding that Husband did not dissipate as much of the marital assets as found by the Trial Court does not change the analysis in any significant manner. We find no error in the Trial Court's distribution of the marital assets as the distribution remains equitable even with our modification of the amount of martial assets that Husband dissipated.

Finally we consider Wife's issue regarding whether she is entitled to an award of attorney's fees on appeal. In the exercise of our discretion, we award Wife attorney's fees on appeal. We remand to the Trial Court for a determination of the correct amount of the attorney's fees award.

## **Conclusion**

The judgment of the Trial Court is modified to reflect that Husband dissipated $73,010 in marital assets and is affirmed in all other respects, and this cause is remanded to the Trial Court for further proceedings consistent with this Opinion and for collection of the costs below. The costs on appeal are assessed against the appellant, Anupam Singla, and his surety.

_____
D. MICHAEL SWINEY, CHIEF JUDGE